UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES O'NEILL, | : |
| Plaintiff, | : |
| v. | : NO. 3:08CV1421 (MRK) |
| CITY OF BRIDGEPORT POLICE DEPARTMENT, | : |
| Defendant. | : |

**RULING AND ORDER**

Plaintiff James O'Neill, a former police officer with Defendant Bridgeport Police Department, brings this claim for religious discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Mr. O'Neill, a Seventh Day Adventist, alleges that Defendant would not accommodate his repeated requests to allow him to take Saturdays off, either by altering his work schedule or shifting him to a position that did not require him to work on Saturdays. He also alleges that Defendant retaliated against him after he requested such an accommodation. Defendant has moved for summary judgment on both of Mr. O'Neill's claims. *See* Mot. for Summ. J. [doc. # 27]. The Court held an oral argument to consider Defendant's motion on May 20, 2010. After carefully considering the parties' briefs and arguments, and for the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment [doc. # 27]. Specifically, the Court grants summary judgment on the discrimination claim but denies summary judgment on the retaliation claim.

1

**I.**

The Court assumes the parties' familiarity with the facts of this case, and recites here only those facts necessary to resolve the pending motion. Other facts will be discussed as needed throughout this ruling. While the parties largely agree on the broad outlines of the facts, some of the specific facts are disputed, and the Court has noted where there are disputes. Mr. O'Neill was hired by Defendant in 1996. In August 2004, he reconnected with Seventh Day Adventism, his childhood faith. Seventh Day Adventists believe that the Sabbath begins on Friday at sundown and ends on Saturday at sundown, and that work should not be done during that time.

As a patrol officer, Mr. O'Neill was on a rotating work schedule of five days on followed by three days off. Therefore, he was scheduled to work approximately 30 Saturdays each year. Initially upon rediscovering Seventh Day Adventism and deciding to observe the Sabbath, Mr. O'Neill used vacation, holiday, and personal days (which, for the sake of simplicity, the Court will refer to collectively as "vacation days" or "vacation time") to take Saturdays off when he was scheduled to work. In 2004 he had a total of 29 vacation days, and by 2006 that number had increased to 34. This meant that in order to take every Saturday off, Mr. O'Neill would have had to use essentially all of his vacation time for that purpose. In addition, Defendant had the discretion to refuse to allow an officer to use a vacation day for manpower reasons, and Defendant occasionally exercised this discretion to require Mr. O'Neill to work on a Saturday. It is undisputed that Mr. O'Neill worked on three Saturdays in 2005, 11 Saturdays in 2006, no Saturdays in 2007, three Saturdays in 2008, and one Saturday in 2009.[1]  *See* Parties' Joint Submission [doc. # 37].

---

[1] Mr. O'Neill was terminated from his position in July 2009. His termination is not part of this lawsuit.

2

According to Defendant, there are two other ways for a Bridgeport police officer to take a day off. First, he can exchange shifts with another member of the Department of the same rank up to 12 times per year. Second, he can convert overtime into "comp time," although presumably Defendant also has the discretion to prevent an officer from using comp time if required by manpower needs. Mr. O'Neill claims that both of these avenues are largely unavailable in practice, *see* Opp'n to Mot. for Summ. J. [doc. # 34] ("Opp'n") at 12, but his counsel also admitted at oral argument that he never tried to utilize either of these options. It should also be noted that Mr. O'Neill admits that his direct supervisor, Lieutenant Robert Evans, "was sensitive to the situation and helped him when he could." *See id*. at 7. Defendant claims that Lieutenant Evans accommodated the "vast majority" of Mr. O'Neill's requests to use vacation time to take Saturdays off, and even gave Mr. O'Neill a few extra vacation days in March 2006.

Mr. O'Neill claims that in January 2005, he first requested an accommodation that would allow him not to work Saturdays without using his vacation time. Specifically, he claims that he sent a letter to Captain Nelson Kearney, which was forwarded to Acting Chief Anthony Armeno. Defendant denies any knowledge of such a request, but of course the Court is required to resolve all factual disputes in Mr. O'Neill's favor on summary judgment, and Mr. O'Neill has produced evidence that strongly supports his version of events. *See* Opp'n [doc. # 34] Ex. 2 (letter from Mr. O'Neill to Captain Kearney, dated January 3, 2005); *id*. Ex. 3 (letter from Minister Pedro Huaringa to Captain Kearney on behalf of Mr. O'Neill, dated January 1, 2005); *id*. Ex. 5 (letter Sergeant Donald Jacques, President of Local 1159 of the police union, to Acting Chief Armeno regarding Officer O'Neill's request for accommodation, dated March 3, 2005). Mr. O'Neill never received a response to this request.

Shortly thereafter, Mr. O'Neill was transferred to the traffic division because of his alleged involvement in a domestic dispute. After those charges were dropped, he was transferred back to patrol, but was put on the 4:00pm-midnight shift (previously he had been on the more desirable 8:00am-4:00pm shift). He was later transferred back to the 8:00am-4:00pm shift.[2]

Mr. O'Neill claims that he next raised the issue of a religious accommodation in mid- to late-2005 (the precise date is unclear). He was called into a meeting at which he was disciplined for being without his flashlight during a personnel inspection. At that meeting, he told Captain Chapman of his need for an accommodation, and Captain Chapman said that he would mention the issue to the Chief.[3] Again, Mr. O'Neill received no response.

Whether Mr. O'Neill made any requests for accommodation in 2005 (and again, the Court assumes that he did), it is undisputed that he made such a request in March 2006. The request was passed up the chain and eventually ended up in front of Acting Chief Armeno, who recalls forwarding the issue to either the City's Labor Relations Department or the City Attorney's Office for advice. *See* Def.'s Mot. and Br. in Supp. of Summ. J. [doc. # 27] ("Mot. for Summ. J.") at 12. Acting Chief Armeno does not recall receiving any response, and he was replaced as Chief by Bryan Norwood shortly thereafter. Again, Mr. O'Neill received no response to his request. Mr. O'Neill

---

[2] It is unclear from the parties' briefs when exactly these shift changes occurred. It appears that Mr. O'Neill was on the evening shift for at least several months, and was transferred back to the day shift in late 2005 or early 2006.

[3] It is not clear who the Chief was at that time. Mr. O'Neill seems to suggest that it was Bryan Norwood, but he did not become Chief until April 2006. Because of this discrepancy, Defendant argues that Mr. O'Neill's conversation with Mr. Chapman could not have happened before April 2006 (if it happened at all). The Bridgeport Police Department had several Chiefs between 2004 and 2009 (when Mr. O'Neill was terminated), with Anthony Armeno stepping in as Acting Chief on more than one occasion.

claims that he was subject to discipline on several occasions after he submitted, and in retaliation for, his repeated requests. *See* Opp'n [doc. # 34] at 8. He also claims that he applied for several positions within the Department that would have allowed him to take Saturdays off, and that he was qualified for such positions, but that other officers were chosen. *See id*. at 9-11. Finally, in April 2007, Mr. O'Neill filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CCHRO). Again, he claims that he was subject to retaliatory harassment and discipline after his CCHRO complaint was filed. *See* Opp'n [doc. # 34] at 11-12.

## II.

The summary judgment standard is familiar. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll*., 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden,

the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id*. In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

Defendant makes three arguments in support of its Motion for Summary Judgment [doc. # 27]. First, Defendant maintains that it reasonably accommodated Mr. O'Neill's religious needs by allowing him to use vacation time to take Saturdays off, to swap shifts, and to earn comp time by working overtime. Second, it argues that Mr. O'Neill cannot establish a prima facie case of discrimination because he was not subject to an adverse employment action. And third, Defendant claims that accommodating Mr. O'Neill in the manner he requested – i.e. allowing him to take every Saturday off without using his vacation time – would create an undue hardship for Defendant. As for Mr. O'Neill's retaliation claim, Defendant argues that it also must fail because he has not shown that he was subject to an adverse employment action. *See id*. at 40-42.

Because the Court agrees with Defendant that Mr. O'Neill has not shown he was subject to an adverse employment action for the purposes of his religious discrimination claim, the Court need not address Defendant's argument regarding reasonable accommodation and undue hardship. However, the Court concludes that Mr. O'Neill has successfully raised several disputed issues of material fact regarding to his retaliation claim, and thus summary judgment on that claim is not appropriate.

**A.**

Under Title VII, an employer may not discriminate on the basis of religion. *See* 42 U.S.C. § 2000e-2(a)(1). "In brief, it is 'an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'" *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)). In order to make out a prima facie case of religious discrimination, a plaintiff must show "(1) [he] held a bona fide religious belief conflicting with an employment requirement; (2) [he] informed [his] employer[] of this belief; and (3) [he was] disciplined for failure to comply with the conflicting employment requirement." *Id.* (internal quotation marks and citation omitted). "Once a prima facie case is established by the employee, the employer 'must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" *Id.* (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).

Defendant does not dispute that Mr. O'Neill has satisfied the first two prongs of his prima facie case – in other words, it concedes that he had a bona fide religious belief that conflicted with an employment requirement and that his supervisors were so informed.[4] However, Defendant maintains that Mr. O'Neill has not satisfied the third prong. As described above, the third prong of Mr. O'Neill's prima facie case is that he was "disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546. Other district courts in the Second Circuit have described this prong as requiring "some adverse employment action – typically, discipline, demotion,

---

[4] As previously noted, there is some dispute about *when* Defendant was informed. But this turns out to be immaterial for the purposes of the discrimination claim (although it might be relevant to the retaliation claim).

transfer or termination – for refusing to comply with the conflicting employment requirement." *Bowles v. New York City Transit Auth.*, Nos. 00 Civ. 4213 (BSJ) (MHD), 03 Civ. 3073 (BSJ) (MHD), 2006 WL 1418602, at *9 (S.D.N.Y. May 23, 2006); *see also Durant v. NYNEX*, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) ("Durant has not established a prima facie case of religious discrimination because she was never disciplined for her failure to work on the Sabbath. A plaintiff must show that she has suffered an adverse change in the conditions of her employment.").

> This Circuit holds that the law thus requires a plaintiff to demonstrate that he has "endure[d] a 'materially adverse change' in the terms and conditions of employment. . . . A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."

*Bowles*, 2006 WL 1418602, at *10 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "In short, a complained-of action must have some real consequence in terms of a plaintiff's working conditions." *Id.*

Mr. O'Neill contends that he was subject to an adverse employment action in four ways: (1) he was forced to work on some Saturdays; (2) he was required to use his vacation time to take Saturdays off; (3) he was temporarily transferred from the day shift to the night shift; and (4) Defendant refused to transfer him to another assignment that would have allowed him Saturdays off. *See* Opp'n [doc. # 34] at 16-18. However, none of these events – however unpleasant for Mr. O'Neill – amount to an adverse employment action, at least for the purposes of a religious discrimination claim.

The Court begins with the fact that Mr. O'Neill was forced to work on some Saturdays – most notably, 11 Saturdays in 2006. There is no question that this created a significant conflict with Mr.

O'Neill's religious beliefs. As discussed later, it might indicate that Defendant failed to offer him a reasonable accommodation. But being forced to work on a day that he was scheduled to work is not an adverse employment action, despite Mr. O'Neill's objection to working on Saturdays. The Court reaches this conclusion for two reasons. First, being required to work on Saturdays was not a "materially adverse change" in the terms and conditions of Mr. O'Neill's employment. His position as a Bridgeport Patrol Officer had always required him to work on Saturdays; a fact of which he was well aware. *See Bowles*, 2006 WL 1418602, at *10. Second, if being confronted with a conflict between the requirement of one's employment and one's religion were sufficient to satisfy the adverse employment action element of the prima facie case, that would render the adverse employment action prong of the test meaningless. Every non-frivolous religious discrimination suit based on an alleged failure to accommodate arises from such a conflict. In other words, if the existence of a conflict alone was an adverse employment action, that element of the prima facie case would be satisfied in every such case. The Court declines to adopt this conclusion.

The Court also rejects Mr. O'Neill's claim that he suffered an adverse employment action because he was forced to use his vacation days to take Saturdays off, and thus could not use them for other purposes such as an actual vacation. Mr. O'Neill was not deprived of a material benefit, he simply chose to use the benefit in a particular way. Defendant gave each of its employees a certain number of vacation days based on seniority, and each employee could use his days however he pleased. In this respect, Mr. O'Neill was in precisely the same position as all other Bridgeport police officers (and in 2006, as a result of Lieutenant Evans' generosity, Mr. O'Neill even received a few extra vacation days).

Finally, neither Mr. O'Neill's temporary reassignment to the night shift nor Defendant's

refusal to transfer him to another position amounts to an adverse employment action for the purposes of the religious discrimination claim. This is because neither action was "discipline[] for failure to comply with the conflicting employment requirement." *See Bowles v. New York City Transit Auth.*, 285 Fed. Appx. 812, 813 (2d Cir. 2008) (summary order); *see also Reed v. Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am.*, 569 F.3d 576, 580 (6th Cir. 2009) ("Unless a plaintiff has suffered some independent harm caused by a conflict between his employment obligation and his religion, a defendant has no duty to make any kind of accommodation."). Mr. O'Neill's counsel admitted as much at oral argument. Nor could these actions (or lack thereof) be discipline for Mr. O'Neill's failure to work on Saturdays because he *did* work on Saturdays when required to do so. In other words, he was never insubordinate and thus there was never cause for discipline.

The Court acknowledges that, in holding that Mr. O'Neill did not suffer an adverse employment action, it has come to a conclusion that some might find discomfiting. Specifically, Mr. O'Neill's problem in this case is that he was a diligent employee who never refused to work on a Saturday when he was required to do so, despite the conflict with his religion. On the other hand, had Mr. O'Neill just refused to show up on a Saturday and been terminated or disciplined for his disobedience, there is no question that he would have satisfied the adverse employment action prong of the prima facie case. This seems like an anomalous result. Should an employee have to risk termination in order to bring a religious discrimination claim based on a failure to accommodate? Based on the case law, the answer appears to be "yes" – and there might actually be a good reason for such a requirement. By bringing the situation to a head, it puts the onus on the parties to resolve their dispute before turning to the courts. An employer, faced with an employee who feels so

strongly about his religion that he would risk his job, might think twice about disciplining him and search for an accommodation that is acceptable to both parties.

The Court is not suggesting that an employee must *always* be insubordinate to bring a religious discrimination claim. For example, if, hypothetically, Defendant had responded to Mr. O'Neill's request for an accommodation in this case by demoting him to a position that had Saturdays off but paid significantly less, such a demotion would undoubtedly have been an adverse employment action, and Mr. O'Neill would have been able to bring a lawsuit arguing that Defendant did not offer him a reasonable accommodation without any insubordination. Nonetheless, it will usually be the case (and in practice usually is the case) that the adverse employment action in a religious discrimination case alleging a failure to accommodate will be discipline or termination as a result of an employee's insubordination.

**B.**

Because the Court concludes that Mr. O'Neill did not suffer an adverse employment action, the Court grants Defendant's Motion for Summary Judgment [doc. # 27] on his religious discrimination claim on this basis, and need not rule on Defendant's argument that it offered a reasonable accommodation. Nonetheless, although it does not decide this issue, the Court will address it briefly.

An offered accommodation is reasonable where it "eliminate[s] the conflict between the employment requirement and the religious practice." *Baker*, 445 F.3d at 548. However, "employees are not entitled to hold out for the most beneficial accommodation," and "[o]rdinarily, questions of reasonableness are best left to the fact finder . . . ." *Id*. (internal quotation marks and citations omitted). The Second Circuit has "provided some guidance in this area by observing that an offer

11

of accommodation may be unreasonable 'if it cause[s] [an employee] to suffer an inexplicable diminution in his employee status or benefits. . . . In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification, such as the neutral operation of a seniority system.'" *Id*. (quoting *Cosme*, 287 F.3d at 160).

The evidence suggests that Mr. O'Neill was often able to take Saturdays off by using his vacation days. It is not unreasonable for an employer to require an employee to use his vacation days as part of a religious accommodation. *See Durant*, 101 F. Supp. 2d at 233-34 ("NYNEX told Durant that she may swap shifts on an ongoing basis and use vacation days to cover for her shifts which conflict with the Sabbath. NYNEX has indeed done so, excusing plaintiff's prior absences and permitting her to use vacation time and to swap shifts-which she has done. As a matter of law, NYNEX's accommodations are reasonable."); *id*. at 234 ("Moreover, Durant has never asserted any factual matter which questions the reasonableness of these accommodations. She has only intimated that it would be unfair to require her to use her vacation time when NYNEX could just excuse her from working Saturday shifts."); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986) (holding that allowing an employee to take unpaid leave is generally a reasonable accommodation). Furthermore, Mr. O'Neill also had the opportunity to swap shifts and use comp time to take Saturdays off. *See Durant*, 101 F. Supp. 2d at 233-34; *Genas v. State of New York Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996) (concluding that employer offered a reasonable accommodation by allowing shift swaps). As previously mentioned, his counsel admitted at oral argument that he did not try to take advantage of these options.

Nonetheless, for two reasons the Court doubts that Defendant offered Mr. O'Neill a reasonable accommodation. First, Mr. O'Neill was forced to work on 11 Saturdays in 2006. Thus,

Defendant cannot be said to have offered an accommodation that eliminated the conflict between the requirements of his job and those of his religion. If Mr. O'Neill had been required to work on only a few Saturdays in a year – as was the case in 2005, 2007, 2008, and 2009, where he worked on three, zero, three, and one Saturdays respectively – it is possible that he would have been able to completely eliminate the conflict had he pursued shift swapping or comp time. However, it is highly unlikely that those other options, even if Mr. O'Neill had utilized them, would have covered the 11 Saturdays that he worked in 2006.

The second reason that the Court is skeptical of Defendant's reasonable accommodation argument is Defendant's complete and utter failure to respond to Mr. O'Neill's repeated request for an accommodation. The Supreme Court has noted that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotation marks and citation omitted). Defendant in this case did not cooperate with Mr. O'Neill at all – instead his superiors at the Department repeatedly ignored his requests, despite indisputable evidence that they were aware of the conflict and Mr. O'Neill's attempts to approach them to discuss a resolution. Whether motivated by discrimination or negligence, the behavior of Mr. O'Neill's superiors is simply unacceptable. This is not to say that a formal response to an employee's request for an accommodation is always necessary for an accommodation to be reasonable. *See, e.g.*, *Rodriguez v. City of Chicago*, 156 F.3d 771, 777-78 (7th Cir. 1998). But an employer's complete disregard of an employee's request for a religious accommodation certainly weighs against a finding of a reasonable accommodation. In this case, Defendant's failure to respond led Mr. O'Neill to continue to have to work on Saturdays.

Therefore, while the Court need not, and does not, decide this issue, the Court fails to see

13

how Defendant could be said to have offered Mr. O'Neill a reasonable accommodation. The Court also does not address whether it would have been an undue hardship on Defendant to reasonably accommodate Mr. O'Neill.

## C.

Finally, the Court turns to Mr. O'Neill's retaliation claim. Claims of retaliation under Title VII are governed by the familiar *McDonnell Douglas* burden shifting framework. "To make out a prima facie case of retaliation, a plaintiff must show (1) his participation in a protected activity known to the defendant, (2) an employment action that disadvantages the plaintiff, and (3) a causal connection between the protected activity and the adverse employment action." *Bowles*, 2006 WL 1418602, at *11 (citing *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). Once a plaintiff establishes his prima facie case:

> The burden then shifts to the defendant to rebut that presumption . . . by putting forward legitimate reasons for its challenged actions. If the defendant carries that burden, plaintiff, to survive summary judgment, must be able to point to evidence from which a finder of fact could reasonably conclude that the proffered legitimate reasons were merely a pretext for impermissible retaliation.

*Id*.

Defendant argues that Mr. O'Neill's retaliation claim must fail because he has not shown that he was subject to an adverse employment action. *See* Mot. for Summ. J. [doc. # 27] at 40-42. However, Defendant's argument is based on the definition of adverse employment action for Title VII discrimination claims. The definition of adverse employment action for Title VII retaliation claims is quite different. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006).

The *White* Court ruled that "the anti-retaliation provision [of Title VII], unlike [Title

>VII's] substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." . . . Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *White*, 548 U.S. at 64, 68 (internal quotation marks and citation omitted)). That said, "petty slights or minor annoyances" are not sufficiently material to amount to an adverse employment action even in the context of a retaliation claim. *White*, 548 U.S. at 68.

Mr. O'Neill alleges that several of Defendant's actions were retaliatory: (1) temporarily assigning him to the night shift, *see* Opp'n [doc. # 34] at 5; (2) disciplining him for failing to carry a flashlight, *see id*. at 6, (3) calling him in to work on a Saturday for training even though he had been granted a vacation day, *see id*. at 8; (4) disciplining him for misplacement of a handheld radio, *see id*.; (5) denying his requests for reassignment, *see id*. at 9-11; and (6) other "petty harassment and discipline," *id*. at 11-12. The Court has no trouble concluding that at least some of these events rise to the level of adverse employment actions in the context of a retaliation claim. There are multiple factual disputes as to whether these actions were motivated by impermissible retaliation as a result of Mr. O'Neill's protected activity, but those issues must be resolved by the jury and not the Court. Therefore, the Court denies summary judgment on Mr. O'Neill's retaliation claim.

## IV.

In sum, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment [doc. # 27]. The Court grants summary judgment for Defendant on Mr. O'Neill's religious discrimination claim but denies summary judgment on his retaliation claim. The Court will issue

a separate order scheduling a telephonic conference to discuss next steps in this case and schedule a trial.

                              IT IS SO ORDERED.

                              /s/      Mark R. Kravitz
                                 United States District Judge

Dated at New Haven, Connecticut: **May 25, 2010**.